UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANE DOE B, JANE DOE M,<br><br>    Plaintiffs,<br><br>v.<br><br><br>LOYOLA UNIVERSITY CHICAGO<br><br><br>    Defendant. | COMPLAINT & JURY DEMAND |

## INTRODUCTION

1. Jane Doe B and Jane Doe M—former Loyola students—bring this action against Loyola University Chicago ("Loyola" or "University") for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX").

2. Loyola has systemically mishandled and underreported student complaints of sexual misconduct, contrary to federal and state regulations in addition to its own internal policies and procedures, dating back to at least 2011.

3. Despite knowledge sexual assault is endemic and Loyola's students are routinely injured, the University has failed, and continues to fail, to take effective preventive measures and has allowed this dangerous situation to persist and cause harm to students, including Plaintiffs, creating a campus culture of deliberate indifference and tacit acceptance of sexual misconduct.

4. Loyola has shown deliberate indifference to known acts of sexual assault and harassment for at least the past decade.

1

5. This is a related case to *Kane et al v. Loyola University of Chicago* (1:22-cv-06476) pending in the Northern District of Illinois, Eastern Division, before Hon. Jeremy C. Daniel and *Aragon* v. *v. Loyola University of Chicago* (1:23-cv-02772) pending in the Northern District of Illinois, Eastern Division, before Hon. Robert W. Gettleman.

6. Loyola had notice and knowledge a number of serial predators were on the University's campus and failed to prevent Plaintiffs and other students from injury—due only to Defendant's gross negligence and violations of federal and state laws.

7. Title IX, the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/20 ("PSVHEA"), and Loyola's own policies and procedures were designed to protect students—like Plaintiffs—from being preyed on by known sexual assailants.

8. Instead, Plaintiffs were forced to either attend their classes in a hostile environment or abandon their education at Loyola.

9. Plaintiffs' injuries—which include, among others, physical pain and suffering, lost tuition expenses, lost earning capacity and future wages, mental anguish, and past and future medical expenses—were preventable, had the University adhered to its legal obligations and representations made to students and their families about the actions Loyola was undertaking to ensure the University's students were safe.

## PARTIES

10. Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth.

11. Jane Doe B is a former Loyola undergraduate student; Jane Doe B's studies began at Loyola in August 2016. Jane Doe B is a citizen and resident of the State of Illinois.

12. Jane Doe M is a former Loyola undergraduate student; Jane Doe M's studies began at Loyola in August 2016. Jane Doe M is a citizen and resident of the State of the State of Maine.

13.     Defendant Loyola University Chicago is a private educational institution with its primary campus in Chicago, Illinois.

14.     Loyola receives federal funding in many forms, including federal student aid, and as such is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"). Loyola is contractually obligated to enforce Title IX in its programs and all University activities.

## BACKGROUND FACTS RELEVANT TO ALL COUNTS

### *Title IX (20 U.S.C. § 1681 et seq. (2006))*

15.     Title IX of the Education Amendments Act of 1972 promotes equal opportunity by providing that no person may be subjected to discrimination on the basis of sex under any educational program or activity receiving federal financial assistance.

16.     The discrimination prohibited by Title IX includes inequitable treatment of survivors of sexual assault and sexual harassment.

17.     Accordingly, universities receiving federal funds are required to respond promptly and effectively to sexual harassment, including sexual violence, that creates a hostile environment.

### *Clery Act (20 U.S.C.A. § 1092(f))*

18.     After college freshman Jeanne Clery was raped and murdered in her own campus residence, Congress enacted the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act") in 1990.

19.     The Clery Act is designed to provide transparency, ongoing communication, and to promote campus safety by ensuring students, employees, parents, and the broader community are well-informed about important public safety and crime prevention matters.

20.     Pursuant to the Clery Act, institutions that receive federal funds must disclose accurate and complete crime statistics for incidents that are reported to campus security and local law

enforcement as having occurred within the school's so-called "Clery Geography," which includes three general categories:[1]

- On campus: Any building or property that an institution owns or controls within a reasonably contiguous area that directly supports or relates to the institution's educational purposes, including residence halls.

- Non-campus building or property: Any building or property that is owned or controlled by a recognized student organization—including school-recognized fraternity or sorority houses and events for school clubs that occur off campus.

- Public property: All public property within the reasonably contiguous geographic area of the institution that is adjacent to or accessible from a facility the institution owns or controls and that is used for educational purposes.

21. The goal of the notification requirement is to protect members of the constituent campus communities by "aid[ing] in the prevention of similar occurrences."[2]

22. Congress recognized that contemporary campus communities had become increasingly dangerous places.

23. Furthermore, Congress noted that, in roughly eighty percent of crimes on campus, both the perpetrator and the victim were students.[3]

24. Even when sexual violence occurs off campus and not in the context of an educational program or activity, a university must process such complaints and consider the effects of the sexual violence when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity.

---

[1] *See* The Handbook for Campus Safety and Security Reporting (2016 Edition), Department of Education (last accessed September 13, 2022), https://www2.ed.gov/admins/lead/safety/handbook.pdf.

[2] *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 30 (1st Cir. 2007) (quoting 20 U.S.C. § 1092(f)(3)).

[3] *See* Crime Awareness and Campus Security Act of 1990, Pub.L. No. 101–542, § 202, 104 Stat. 2381, 2384 (codified as amended at 20 U.S.C. § 1092(f)).

### *Illinois Preventing Sexual Violence in Higher Education Act (110 ILCS 155/1–99)*

25. In 2015, the Illinois Legislature enacted the Illinois Preventing Sexual Violence in Higher Education Act ("PSVHEA"), which, among other requirements, mandates higher education institutions:

- Develop a clear, comprehensive campus sexual violence policy, including detailed incident reporting options and university response guidelines;

- notify student survivors about their rights, including their right to confidentiality, and the protections the university can provide to ensure the student's health and safety, such as obtaining an order of protection, changing class schedules or campus housing, and the availability of medical and counseling services;

- provide a confidential advisor to survivors to help them understand their options and rights, including the options to report the sexual assault and to seek medical and legal assistance;

- have a comprehensive policy to address student allegations of sexual violence, domestic violence, dating violence, and stalking, consistent with federal and state law; and

- respond to a report submitted electronically within 12 hours.[4]

26. Pursuant to the PSVHEA, Loyola is required to publish an annual report, which includes Loyola's Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation ("Comprehensive Policy"), as well as data and information concerning trainings, prevention programs, reported incidents within Loyola's "Clery Geography," and the outcomes/resolution of formal complaints.

### *Loyola's Internal Policies & Procedures ("Comprehensive Policy")*

27. In addition to the federal and state regulations described above, Loyola has its own internal policies and procedures once a student reports sexual misconduct, as detailed in the University's

---

[4] *See* Loyola University Chicago, Office for Equity & Compliance, "Illinois Preventing Sexual Violence in Higher Education" (last accessed September 11, 2022), https://www.luc.edu/equity/titleixequitylaws/illinoispreventingsexualviolenceinhighereducationact/.

5

Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation ("Comprehensive Policy").[5]

28. According to Loyola's Office for Equity & Compliance, Loyola's internal policies and procedures "meet[] or exceed[] the requirements of federal and state civil rights laws and regulations to provide for a prompt, fair, and equitable administrative process."

29. In relevant part, the University's Comprehensive Policy provides:

- A preponderance of the evidence standard is used to determine whether a respondent is responsible for violating the Comprehensive Policy. This standard requires that the totality of the evidence, considered impartially, must indicate that it is more likely than not that the Comprehensive Policy was violated.

- Complainants *may* be accompanied by one advisor of their choice, provided that the selection of the advisor does not cause an undue delay of the Grievance Process, but the University will not delay meetings or proceedings to accommodate an advisor's availability.

- Complainants *may* request assistance from Loyola in identifying an available advisor, but the University does "not ensure or guarantee the quality or availability of any University-provided advisor."

- An advisor may be any person of the party's choosing, including an attorney; when an advisor is also an attorney, this must be disclosed to the University, and the advisor is limited to a "supportive" and "non-representative role." An attorney of the University's choosing may also attend any proceeding whenever an attorney serving as an advisor is present.

- Upon receiving a report of sexual misconduct, the University may implement a no contact directive; in all cases in which a no contact directive is implemented, the relevant parties will be promptly informed in writing of the conditions, duration, and applicable parameters of the directive.

- The University aims to complete all investigations into students' report of sexual misconduct within six months of receipt of the initial complaint.

---

[5] *See* Loyola University of Chicago Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation, (last accessed September 12, 2022), https://www.luc.edu/media/lucedu/equity/pdfs/LUC%20Comprehensive%20Policy_2022-2023.pdf.

- If an alleged violation of sexual misconduct is substantiated, the violating party may be subject to a range of outcomes—including suspension, expulsion, and the University withholding or revoking the assailant's transcript or degree.

30. At the beginning of each academic year, a copy of Loyola's Comprehensive Policy is published and shared with University students, employees, parents, and the broader community. The above excerpts are from Loyola's 2020 Comprehensive Policy, but, upon information and belief, the University's Comprehensive Policy has remained materially the same since 2011.

### *Factual Allegations of Jane Doe B and Jane Doe M*

31. Plaintiffs both enrolled as undergraduate students at Loyola in August 2016.

32. During the Fall 2016 semester, both Plaintiffs were sexually assaulted by their former male classmate—a known serial predator.

33. Loyola administrators were made aware of Plaintiffs' assaults in February 2017, but Plaintiffs' assailant was allowed to remain living on campus and taking classes for the next 2.5 years with unfettered access to other victims, despite the University's knowledge female students had come forward to report he sexually assaulted them on Loyola's campus; Plaintiffs were forced to attend classes with and see their assailant on campus for 2.5 years after their assaults.

34. When Plaintiffs questioned Loyola administrators as to why he was allowed to remain of compus, they were told, "he's not a threat to campus," so he was not banned outright.

35. Though administrators were first made aware of Plaintiffs' sexual assaults in February 2017, no action was taken by Loyola to investigate or remove Plaintiffs' assailant from the University until Plaintiffs filed separate "formal" investigations with Loyola's Title IX office during the first week of December 2018; a third victim also filed a separate "formal" investigation against Plaintiffs' assailant in December 2018.

7

36. Each case was assigned to different investigators, who were Loyola employees with other roles at the school "trained" and tasked with handling Title IX investigations as needed.

37. Jane Doe M worked at Loyola, and yet inexplicably, the investigator assigned to her case turned out to be her boss. When Jane Doe M expressed discomfort with her boss investigating her sexual assault, Jane Doe M was required to wait a significant time period for a new investigator.

38. Despite Loyola informing Plaintiffs the "official" Title IX investigation should take 60 days to complete, Plaintiffs were forced to wait nearly six months—from December 2018 to May 2019—for the investigation to conclude, allowing Plaintiffs' assailant to finish his academic year at Loyola and transfer to another university to complete his undergraduate studies thereafter.

39. Jane Doe M remembered words the investigator used to describe her feelings, which she said were inaccurate, including the word "disappointed."

40. The University also sent a summary of the victims' Title IX allegations containing numerous grammatical, content and structural mistakes, in which the titles "complainant" and "respondent" were switched.

41. A Title IX investigator also erroneously sent Jane Doe B's confidential personal information to her assailant—a mistake the investigator only realized after it was brought to the investigator's attention by Jane Doe B.

42. In response, Tim Love conceded, "If I received back a report like that I could understandably be disappointed or not have that sense of trust we're shooting for."

43. Jane Doe M's investigation was the first to conclude and resulted in a guilty finding on March 27, 2019 of rape—formally known as "non-consensual sexual penetration;" Plaintiffs' assailant was then placed on university probation.

44. As "punishment" for rape, Loyola assigned him ten (10) hours of community service "to symbolically repair the harm Respondent caused" and a 3-page double spaced paper on the "meaning of consent;" Tim Love and other administrators encouraged Plaintiffs' assailant to "use resources available on campus, such as those provided by the Wellness Center"—where Love knew Jane Doe M was employed at the Center's front desk.

45. Jane Doe M did not believe this was sufficient and appealed the verdict; her appeal resulted in the assailant's reprimand increasing to a suspension, documents show.

46. Jane Doe B and the assailant's third victim were told by the University they would have an administrative verdict by April 18, 2019, before Easter break. But that day came and went without a verdict, rather Plaintiffs received emails from the school saying the cases would be "queued," creating confusion for the women.

47. On April 26, 2019, a third victim was told the accused student would be expelled, documents show.

48. On May 6, 2019, Jane Doe B was informed the University had finished investigating her case, and, inexplicably, the male student was not found guilty of assault in her case, records show. This erroneous outcome and Loyola's deliberate indifference to Jane Doe B's sexual assault caused Jane Doe B further injury; Jane Doe B did not appeal this decision only because she learned from Loyola administrators that her assailant had been expelled from the University.

49. The Unversity did not inform Plaintiffs—and Plaintiffs were horrified to learn—that Loyola had allowed their assailant to transfer to another instituion to complete his undergraduate studies; upon information and belief, Plaintiffs' assailant is now completing a PhD program, where he teaches, supervises, and has unfettered access to undergraduate students.

50. When Plaintiffs were sexually assaulted, they did not know of the University's policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual violence and sexual harassment.[6]

51. Thereafter, Plaintiffs operated with a heightened sense of fear, anxiety, and stress knowing their assailant continued to be in their classes and on Loyola's campus.

52. Attending classes in such a hostile environment became caused Plaintiffs' physical health and emotional health to decline, and their academic performance to suffer.

53. As a result of the University's wrongdoing and Title IX violations, Plaintiffs have suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

## OTHER SALIENT FACTS

54. Plaintiffs are informed, believe, and on that basis allege, Loyola has systemically mishandled student complaints of sexual violence and sexual harassment, contrary to federal and state mandates and its own internal policies and procedures, dating back to at least 2011.

55. Loyola's student newspaper, *The Phoenix*, has reported:

---

[6] *See Kane v. Loyola Univ. of Chi.*, 22 CV 6476 (N.D. Ill. Mar. 18, 2024) (Title IX claims are subject to Illinois' two-year statute of limitations, and the plaintiffs in *Kane* first filed their complaint on September 21, 2022; a claim accrues "'when a plaintiff knows the fact and the cause of an injury'" and is a question of federal law) (quoting *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 (7th Cir. 2017) and *Wallace v. Kato*, 549 U.S. 384, 391 (2007)). *See also Vander Pas v. Bd. of Regents of Univ. of Wis. Sys.*, No. 21 C 1148, 2022 WL 1597423, at *6 (E.D. Wis. May 19, 2022) (for Title IX claims based on a policy or practice of deliberate indifference, a claim accrues "when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment"); *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 702 (6th Cir. 2022), cert. denied., 143 S. Ct. 2659 (2023) (holding that "[i]n the Title IX context . . . [a] claim does not accrue until the plaintiff knows or has reason to know that the *defendant institution* injured them.") (emphasis in original).

- In 2016, a female student's sexual assault report was lost by the University, which Dean Love acknowledged and apologized for.

- Dean Love has admitted Loyola has an "internal goal" of responding to reports within one business day—despite the fact Illinois law requires universities to respond within 12 hours.

- Multiple protests have been held, on a near yearly basis, by students demanding Loyola do more to combat violent sex crimes from occurring at the University.

- The University allowed a professor to continue teaching classes after determining several students' reports of his sexual misconduct to be credible.

- After Plaintiffs and a third victim reported in 2018 they were raped by the same male student on campus, it took the University six months, despite informing them it would take approximately 60 days, to find the students' allegations to be credible. The University initially sanctioned him by requiring he complete community service and write a paper on the meaning of consent—a gravely disproportional sanction for violently raping three students on campus.

- Students have reported the University's Title IX investigators have made serious errors in witness statements and sent emails with sensitive information to perpetrators versus survivors.

- Loyola found a male student guilty of rape and thereafter expelled and banned him from campus, but still allowed him to participate in his graduation ceremony.

56. Plaintiffs are informed, believe, and on that basis allege, Loyola has also grossly underreported the number of sexually violent incidents that occurred during the years prior to Plaintiffs' enrollment at the University.

57. In December 2017, University Security reported the Chicago Police Department had reported 873 violent crimes in Loyola's jurisdiction since 2013, but the University's Campus Safety had only reported 205.[7]

---

[7] "Loyola Campus Safety Reports a Fraction of Crimes Compared to CPD," *The Phoenix* (updated January 31, 2018), (https://loyolaphoenix.com/2017/11/campus-safety-chronically-reports-crime/.

11

58. Many of the violent crimes not reported by Campus Safety occurred within less than a five-minute walk from the University's campus, including 89 aggravated assaults and batteries, 94 robberies, 44 crimes with guns, and 29 sex crimes.[8]

59. According to Loyola's Preventing Violence in Higher Education Annual Report, in 2016:

- 48 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to Loyola's Title IX Office;

- 66 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to a confidential and anonymous resource; and

- 68 incidents of "off campus" sexual violence, domestic violence, dating violence, and stalking were reported.[9]

60. Thus, in total, there were 182 incidents of sexual violence, domestic violence, dating violence, and stalking reported by Loyola students in 2016.[10]

61. According to Loyola's Preventing Violence in Higher Education Annual Report, in 2017:

- 36 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to Loyola's Title IX Office; and

- 93 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to a confidential and anonymous resource.[11]

---

[8] *Id.*

[9] *See* Loyola's 2016 Preventing Violence in Higher Education Annual Report (last accessed September 12, 2022):
https://www.luc.edu/media/lucedu/equity/pdfs/Loyola%20Univeristy%20Chicago_Annual%20Report%202016.pdf.

[10] *Id.*

[11] *See* Loyola's 2017 Preventing Violence in Higher Education Annual Report (last accessed September 12, 2022):
https://www.luc.edu/media/lucedu/equity/pdfs/Loyola%20University%20Chicago%202018%20ILPSVHE%20Annual%20Report%20(Submitted%20November%201,%202018).pdf.

62. Loyola did not publish how many incidents occurred "off campus" or at "non-campus buildings or properties" in 2017, or any year thereafter.[12]

63. Despite 129 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking reported to have occurred in 2017—and an unknown number of off-campus incidents—not a single student was reprimanded by the University in 2017, as shown below:

Loyola University Chicago                                                                 Part B (II) (B)

**PART B (II)(B) Complaint Resolution Procedure Outcomes**

*It should be noted that several cases reported to have occurred outside of "Clery Geography" (i.e. at off-campus parties, apartments, etc.) were addressed through the complaint resolution process. However, given the reporting guidelines which advise to narrowly report only those incidents which occurred within "Clery Geography," these incidents and their related outcomes are not reflected in the data below.

|  | Found "not responsible" for violation of comprehensive policy | Dismissed/expelled | Suspended | Otherwise disciplined |
|---|---|---|---|---|
| Sexual violence | 0* | 0 | 0 | 0 |
| Domestic violence | 0 | 0 | 0 | 0 |
| Dating violence | 0 | 0 | 0 | 0 |
| Stalking | 0 | 0 | 0 | 0 |

64. The Department of Education Office of Postsecondary Education publishes the most recent three years of a university's self-reported sexual misconduct crime statistics.[13] According, to its website, from 2018 to 2020 Loyola reported:

---

[12] *Id.*

[13] *See* U.S. Department of Education Office of Postsecondary Education (last accessed September 12, 2022), https://ope.ed.gov/campussafety/#/institution/search.

- In 2018, there were 11 incidents of rape and 9 incidents of fondling reported "on campus;" 0 incidents of rape and 0 incidents of fondling were reported on "non-campus" properties; and 0 incidents of rape and 0 incidents of fondling were reported on public properties.

- In 2019, there were 7 incidents of rape and 4 incidents of fondling reported "on campus;" 0 incidents of rape and 0 incidents of fondling were reported on "non-campus" properties; and 2 incidents of rape and 0 incidents of fondling were reported on public properties.

- In 2020, there were 5 incidents of rape and 3 incidents of fondling reported "on campus;" 1 incident of rape and 0 incidents of fondling were reported on "non-campus" properties; and 0 incidents of rape and 1 incident of fondling was reported on public properties.

65. Upon information and belief, the above data grossly underreports the number of violent sexual criminal offenses reported during from 2018 to 2020 within Loyola's Clery Geography, in violation of federal and state regulations in addition to the University's internal policies and procedures.

**FIRST CAUSE OF ACTION**
**VIOLATION OF TITLE IX, 20 U.S.C. § 1681 ("PRE-ASSAULT")**

66. Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

67. The acts, and failures to act, perpetrated against Plaintiffs amounted to unlawful sexual harassment and discrimination on the basis of gender.

68. Loyola maintained a *de facto* policy to suppress reports of sexual violence and sexual harassment, and to support accused campus predators, resulting in a culture of deliberate indifference toward sexual misconduct at Loyola.

69. Loyola had a *de facto* policy or practice of deliberate indifference to sexual assault that caused them to suffer or be vulnerable to severe, gender-based harassment.

70. Plaintiffs allege that (1) Loyola maintained a *de facto* policy of deliberate indifference to reports of sexual misconduct, (2) the policy created a heightened risk of sexual harassment that was known (3) in a context subject to Loyola's control, and (4) as a result, Plaintiffs suffered

14

harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived them of access to the educational opportunities or benefits provided by Loyola.

71. Loyola had actual knowledge its policies and procedures, as written and implemented, were enabling acts of sexual violence against its students, including Plaintiffs.

72. The University maintained a *de facto* policy, detailed throughout this Complaint, to suppress reports of sexual violence and sexual harassment, and to support accused campus predators, resulting in a culture of deliberate indifference toward sexual misconduct at Loyola.[14]

73. Thus, Loyola's actions and inaction evidence an official decision by Dean Love, Loyola's Title IX coordinator, and other high-ranking University officials, not to remedy Loyola's systemic mishandling and underreporting of sexual violence.

74. In sum, Plaintiffs have stated pre-assault claims by alleging that Loyola adopted a policy of deliberate indifference that subjected students to a heightened risk of being sexually assaulted.

75. As a result of Loyola's pre-assault discrimination and deliberate indifference, Plaintiffs are entitled to recover their damages and reasonable attorneys' fees and costs of litigation from the University.

---

[14] The Tenth Circuit has concluded that Title IX liability exists "when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007).

*See also Posso v. Niagara Univ.*, No. 19-CV-1293-LJV-MJR, 2020 WL 8771334, at *6 (W.D.N.Y. Nov. 2, 2020), report and recommendation adopted, 518 F. Supp. 3d 688 (W.D.N.Y. 2021) (the Court finds *Simpson* and *Karasek* [cited *supra,* in Footnote 3] persuasive for the premise that a university can certainly be liable under Title IX for a policy of deliberate indifference to a heightened risk of sexual harassment known to exist within a particular group or context, and possibly beyond that).

## SECOND CAUSE OF ACTION
## VIOLATION OF TITLE IX, 20 U.S.C. § 1681 ("POST-ASSAULT")

76. Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

77. In violation of federal and state regulations as well as in violation of Loyola's own policies and procedures, the University failed to provide Plaintiffs with fair, prompt, and equitable proceedings in response to complaints of sexual misconduct.

78. Plaintiffs allege that the university was deliberately indifferent to their reports of sexual assault because it failed to take disciplinary action, delayed or mishandled their investigations, failed to inform them of resources, and forced them to come into further contact with their harassers.

79. Resultantly, Plaintiffs were subjected to erroneous outcomes: Plaintiffs' assailant was erroneously found not guilty, despite overwhelming evidence surpassing the University's preponderance standard; he was allowed to finish the academic year and received no effective sanction, besides community service and writing a paper on consent, until Plaintiffs appealed.

80. Following Plaintiffs' sexual assaults described above, Dean Love and other high-ranking University administrators became aware of the facts underlying their injuries.

81. In spite of that knowledge, Dean Love and other University officials, with authority to take corrective action on Plaintiffs' behalf, had actual notice of said discrimination and failed to adequately respond. Those failures amounted to deliberate indifference toward the unlawful conduct that was occurring and staggering number of incidents of sexual assault and sexual harassment occurring on Loyola's campus and within non-campus properties and buildings—especially fraternity houses.

82. Loyola's well-documented pattern of discrimination and sexual misconduct against female victims and in favor of male assailants, created an atmosphere on campus that was permeated with

discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of the education and create a sexually hostile environment for Plaintiffs.

83. Loyola's actions are clearly unreasonable as they reflect deliberate violations of its own policies. Plaintiffs also allege that Loyola's deliberately indifferent response to the allegations caused them to repeatedly encounter their assailant in class and on Loyola's campus for six months. Allegations that a school subsequently allowed the assailant to remain in classes with and on campus, in close contact with his victims, are sufficient to allege that the funding recipient's response to harassment was clearly unreasonable. Being forced to encounter one's assailant constitutes further sexual harassment. Plaintiffs' allegations are therefore sufficient to allege that Loyola acted with deliberate indifference to their sexual harassment.

84. The University's response to Plaintiffs was so hostile as to compound their injuries, constituting retaliation under Title IX.

85. Additionally, and/or in the alternative, Loyola failed to enact and/or disseminate and/or implement proper or adequate policies to discover, prohibit or remedy the kind of discrimination that Plaintiffs suffered. This failure included, without limitation, nonexistent and inadequate enforcement policies and procedures for the recognition, reporting, investigation, and correction of unlawful discrimination. Loyola acted with deliberate indifference in deviating significantly from the standard of care it owed Plaintiffs.

84. As a result of Loyola's post-assault discrimination and deliberate indifference, Plaintiffs are entitled to recover their damages and reasonable attorneys' fees and costs of litigation from the University.

**PRAYER FOR RELIEF AND JURY DEMAND**

Wherefore, based on the foregoing causes of action, Plaintiffs demand judgment against Loyola in an amount to fully and fairly compensate Plaintiffs for their injuries; together with litigation costs, expenses and reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and any and all other relief to which Plaintiffs may be justly entitled. Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 10, 2024                                   Respectfully submitted,

                                                            _____
                                                            Ashley M. Pileika
                                                            Darren Wolf*
                                                            Law Office of Darren Wolf, P.C.
                                                            1701 N. Market St., Suite 210
                                                            Dallas, Texas 75202
                                                            Tel: 214.346.5355
                                                            Fax: 214.346.5909
                                                            ashley@darrenwolf.com
                                                            darren@darrenwolf.com

                                                            Elizabeth A. Fegan
                                                            Fegan Scott LLC
                                                            150 S. Wacker Dr., 24th Floor
                                                            Chicago, Illinois 60606
                                                            Tel: 312.741.1019
                                                            Fax: 312.264.0100
                                                            beth@feganscott.com

                                                            Joel Wertheimer*
                                                            Wertheimer LLC
                                                            14 Wall St., Suite 1603
                                                            New York, NY 10005
                                                            Tel: 646.720.1098
                                                            joel@joelwertheimer.com

*Counsel for Plaintiffs Jane Doe B & Jane Doe M*

*\*Pro hac vice application forthcoming*